NUMBER 13-02-607-CR

 

                         COURT OF APPEALS

 

                     THIRTEENTH
DISTRICT OF TEXAS

 

                         CORPUS
CHRISTI - EDINBURG 

                                                                                                                     


 

RAFAEL
JAVIER RODRIGUEZ,                                                     Appellant,

 

                                                             v.

 

THE
STATE OF TEXAS,                                                                  Appellee.

                                                                                                                      


      On appeal
from the 92nd District Court of Hidalgo County, Texas.

                                                                                                                     


 

                                          O P I N I O N

 

                                        Before
the Court En Banc

                                        Opinion
by Justice Yañez              

 








A jury found appellant, Rafael Javier Rodriguez,
guilty of intoxication assault[1]
and sentenced him to six years of imprisonment and a $10,000.00
fine.  By eleven issues, appellant
challenges (1) the legal and factual sufficiency of the evidence to support his
conviction (issues one and two); (2) the trial court=s denial of his motion to suppress on grounds (a) he
was unlawfully arrested (issue three) and/or (b) he was unlawfully detained
(issue four); (3) admission of the videotape in violation of articles 38.22 and
38.23 of the code of criminal procedure (issue five); (4) admission of his
refusal to take a breath test at his residence on grounds that (a) his
continued detention was unlawful (issue six) and (b) he was not given the
statutory warnings required to take a breath sample if he was under arrest, and
if he was not under arrest (as the State argues), the request for a breath
sample was improper (issue seven); (5) the exclusion of two photographs from
evidence (issue eight); and (6) the denial of his motion for new trial on
grounds that (a) the State failed to disclose evidence favorable to his defense
(issue nine), (b) the newly-discovered favorable evidence likely would have
changed the outcome of the trial (issue ten), and (c) his trial counsel was
ineffective for failing to discover the favorable evidence (issue eleven).  We affirm. 

                                                                I.  Background[2]








At approximately 9:30 p.m. on the evening of
November 8, 2001, appellant, then a municipal judge in Elsa, Texas, was driving
a van on FM 88 near his residence in Elsa. 
The van struck a motorcycle driven by Linda Perez.  At trial, Officer Jaime Cano testified that
he was the first police officer to arrive at the scene of the accident. Cano
testified that  when he arrived, he
observed the motorcycle, missing its front wheel and driver, on the side of the
road, approximately seventy-five feet from the van.  Onlookers gathered at the scene reported that
Perez was pinned underneath the van.  EMS
and fire department personnel removed Perez from under the van.  Cano testified that Perez had suffered severe
injuries and that she was airlifted from the scene for emergency
treatment.  

  After one of
the onlookers identified appellant as the driver of the van, Officer Cano
approached appellant and asked him what had occurred.  Appellant said he thought he had hit a
dog.  Cano directed appellant to sit in
Cano=s police car. 
Officer Ricardo De Hoyos arrived and directed Officer Flavio Garcia to
transport appellant to the police station in order to conduct a field sobriety
test on appellant.  Garcia testified that
he drove appellant to the police station in Cano=s
police car; he was unaware that a video camera inside the car recorded his
conversation with appellant during the drive. 
De Hoyos testified that at the station, he conducted three field
sobriety tests on appellant, which appellant passed.  Elsa Police Chief, Primitivo Rodriguez,
testified that he observed only one of the field sobriety tests at the station
and that appellant passed the test. 
Shortly thereafter, appellant was released and was driven home by a
friend, the Honorable Espiridion (ASpeedy@) Jackson, a justice of the peace for Hidalgo County
at that time.  








Officer J. P. Rodriguez testified that at the time,
he was the only Elsa police officer certified to conduct field sobriety
tests.  According to Officer Rodriguez,
when he arrived at the police station, appellant had been released.  After Officer Rodriguez advised the Chief
that Officer De Hoyos was not certified to conduct field sobriety tests, the
Chief ordered Officer Rodriguez to go to appellant=s house to conduct another field sobriety test and
obtain a blood or breath specimen from appellant.  Officer Rodriguez testified that
approximately an hour and forty minutes after the accident, he arrived at
appellant=s residence and performed three additional field
sobriety tests, which appellant passed. 
Officer Rodriguez testified that he attempted to read appellant the
required statutory warnings, but he was unable to do so because appellant kept
interrupting.  Officer Rodriguez
testified that he requested that appellant provide either a breath or blood
sample, but appellant refused.   

                                                II.  Legal and Factual Sufficiency

In his first and second issues, appellant contends
the evidence is legally and factually insufficient to support his conviction.

                                                         A.  Standard of Review 

In a legal sufficiency review, we view all of the
evidence in the light most favorable to the verdict and then determine whether
a rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt.[3]  This standard gives Afull play to the responsibility of the trier of fact
fairly to resolve conflicts in the testimony, to weigh the evidence, and to
draw reasonable inferences from basic facts to ultimate facts.@[4] 

We measure the legal sufficiency of the evidence
against the elements of the offense as defined by a hypothetically correct jury
charge for the case.[5]  ASuch a charge would be one that accurately sets out
the law, is authorized by the indictment, does not unnecessarily increase the
State's burden of proof or unnecessarily restrict the State's theories of
liability, and adequately describes the particular offense for which the
defendant was tried.@[6]








The jury, as the trier of fact, may use common sense
and apply common knowledge, observation, and experience gained in ordinary affairs
when giving effect to the inferences that may be reasonably drawn from the
evidence.[7]  As fact finder, the jury is the exclusive
judge of the credibility of witnesses and the weight to be afforded their
testimony.[8]  The jury is free to accept one version of the
facts, reject another, or reject all or any of a witness's testimony.[9]

In a factual sufficiency review, we view all of the
evidence in a neutral light, and we will set the verdict aside only if the
evidence is so weak that the verdict is clearly wrong and manifestly unjust, or
the contrary evidence is so strong that the standard of proof beyond a
reasonable doubt could not have been met.[10]  We are not bound to view the evidence in the
light most favorable to the prosecution, and may consider the testimony of all
the witnesses.[11]  Disagreeing with the fact finder's
determination is appropriate only when the record clearly indicates that such a
step is necessary to arrest the occurrence of a manifest injustice; otherwise,
due deference must be accorded the fact finder's determinations, particularly
those concerning the weight and credibility of the evidence.[12]








Here, appellant was convicted of intoxication
assault.  Thus, a hypothetically correct
jury charge would ask the jury if (1) appellant (2) operated a motor vehicle
(3) while intoxicated, and (4) by reason of that intoxication, (5) caused
serious bodily injury to another.[13]

                                                                   B.  Analysis

                                                            1.  Legal Sufficiency

In his first issue, appellant challenges the legal
sufficiency of the evidence to support his conviction.  Specifically, he contends the evidence is
legally insufficient to support the elements of either (1) intoxication or (2)
causation (that the accident was caused by reason of that intoxication).[14]  The State contends the evidence is legally
sufficient to support appellant=s conviction.

Officer Cano testified that when he approached
appellant at the scene of the accident and escorted him to his police car, he
observed that appellant was staggering badly and smelled strongly of
alcohol.  According to Cano, appellant
was staggering so badly that he had to hold on to Cano=s shoulder to keep from falling down.  He also testified that when he looked inside
appellant=s van, he observed an open twenty-four-ounce can of
beer on the driver=s side of the front console.  He also observed three unopened cans of beer
on the floorboard behind the driver=s seat.  Cano
testified that he prepared an accident report based on all the information he
obtained investigating the accident. 
According to the report, appellant was traveling southbound on FM 88,
attempted to turn left, and failed to yield the 
right-of-way to the motorcycle, causing the accident.  








Officer De Hoyos testified that when he first
encountered appellant at the scene, appellant was sitting in Cano=s police car and smelled strongly of alcohol.  At the trial, De Hoyos initially testified that
he did not request a breath sample from appellant at the station, but after
being reminded of his grand jury testimony, he testified that he did ask
appellant twice to submit to a breathalyzer test, but that appellant refused.    

Officer Garcia testified that during the ride to the
police station, appellant said that the motorcycle did not have its lights on
and that he thought he had hit a dog. 
When they arrived at the station, appellant asked Garcia if he smelled
like beer.  Garcia testified that at the
station, he observed the second round of sobriety tests administered to
appellant and, in his opinion, appellant did not Apass@ the tests because he was leaning on a filing cabinet.  Garcia testified that, in his opinion,
appellant did not have the normal use of his physical or mental faculties at
the time the tests were administered.  

Officer J. P. Rodriguez testified he did not
encounter appellant at the scene because appellant had already been taken to
the station.  He did observe, however,
that the interior of the van smelled strongly of alcohol, the open can of beer
in the driver=s front console, 
and the unopened cans behind the driver=s
seat.  He also testified that the open
can of beer appeared to be full because he observed condensation on the outside
of the can.  Rodriguez testified that
appellant later told him that he had consumed two to four beers prior to the
accident.  

Appellant testified that he did not see the
motorcycle, but Afelt something hit the van@ when he turned. 
Appellant testified that he later said the motorcycle=s lights were out and that he thought he had hit a
dog.     








Perez, the victim, testified that she is a
motorcycle safety instructor and that the headlight and two driving lights on
her motorcycle come on automatically. 
Perez testified that when the collision occurred, appellant=s van was traveling south on FM 88, but was in the
northbound lane.   

 Viewing this
evidence in a light most favorable to the verdict, we hold a jury could
rationally conclude that appellant was intoxicated and that the accident was
caused by that intoxication.  We overrule
appellant=s first issue. 

                                                          2.  Factual Sufficiency

By his second issue, appellant contends the evidence
is factually insufficient to support the elements of (1) intoxication and (2)
causation (that the accident was caused by reason of that intoxication).  

In addition to the evidence cited above, we note the
following evidence relied upon by appellant.








Officer De Hoyos testified that at the police
station, he performed three field sobriety tests on appellant and that
appellant passed all three tests.  De
Hoyos testified that he conducted a second field sobriety test in the presence
of Chief Rodriguez.  After appellant
passed the second test, Chief Rodriguez ordered that appellant be released.  Similarly, Chief Rodriguez testified that he
was present when appellant took one of the field sobriety tests and that
appellant passed the test.  Officer J. P.
Rodriguez testified that approximately an hour and forty minutes after the
accident, he conducted an additional three field sobriety tests at appellant=s residence, and appellant passed the tests.  Appellant testified that he had only consumed
one beer the night of the accident and that he was not intoxicated.  According to appellant, the beer that was
found in the driver=s front console was not his, but belonged to his
friend, Speedy Jackson.  Jackson
testified that he and appellant were together at a barbecue earlier in the
evening and that he had consumed several beers; however, he did not recall
whether he saw appellant drinking. 
Appellant denied that he was in the wrong lane when the accident
occurred.    

In conducting a factual sufficiency review, an
appellate court must avoid substituting its judgment for that of the fact-finder
and must not intrude upon the fact-finder's role as the sole judge of the
weight and credibility given to witness testimony.[15]  We hold that a neutral review of the evidence
demonstrates that the evidence is factually sufficient to support the jury=s verdict.  We
overrule appellant=s second issue. 

                                                         III.  Motion to Suppress

In his third issue, appellant contends the trial
court erred in denying his motion to suppress because he was arrested without
probable cause.  Appellant argues the
trial court should have suppressed Athe fruits of everything derived from [his] unlawful
arrest,@ including the videotape in the police car, the
events at the police station, and any refusals to submit to a breath test at
the police station or later at appellant=s residence. 
Appellant argues the evidence should have been excluded pursuant to the
Fourth Amendment to the United States Constitution and article 38.23 of the
Texas Code of Criminal Procedure.[16]









Similarly, in his fourth issue, appellant contends
that the trial court erred in denying his motion to suppress because his
detention was unlawful.  Appellant argues
that pursuant to the Fourth Amendment and article 38.23 of the code of criminal
procedure, the trial court should have excluded the Afruits of everything derived from [his] unlawful
detention,@ including the videotape in the police car, the
events at the police station, and any refusals to submit to a breath test at
the police station or later at appellant=s residence.

                                      A.  Standard of Review and Applicable Law

A trial court's ruling on a motion to suppress is
generally reviewed for abuse of discretion.[17]  In a suppression hearing, the trial judge is
the sole trier of fact and judge of the credibility of
the witnesses and the weight to be given to their testimony.[18]  In reviewing a trial court's ruling on a
motion to suppress, we afford almost total deference to the trial court's
determination of the historical facts that the record supports, especially when
the trial court's findings turn on evaluating a witness's credibility and
demeanor.[19]  We afford the same amount of deference to the
trial court's ruling on Aapplication of law to fact questions,@ also known as Amixed questions of law and fact,@ if resolving those ultimate questions turns on
evaluating credibility and demeanor.[20]  However, we review de novo questions
of law and Amixed questions of law and fact@ that do not turn on an evaluation of credibility
and demeanor.[21]


 We uphold a
trial court=s ruling on a suppression motion if it is reasonably
supported by the record and is correct on any theory of law applicable to the
case.[22]

                                                                   B.  Custody








                                                 1.  Applicable Law

As a general rule, a person is not in custody under Miranda[23]
during a routine traffic stop.[24]  Detention and questioning by police officers
during a DWI investigation, without more, is not custody.[25]  A motorist is not in custody under Miranda
Aduring a routine traffic stop for suspicion of DWI
because the circumstances do not place the driver completely at the mercy of
police.@[26]  A[T]he prophylactic warnings required by Miranda
do not attach until the officer has objectively created a custodial environment
and has communicated to the accused his intention to effectuate custody to the
accused himself.@[27]








In determining whether an individual was in custody,
the ultimate inquiry is whether there was a formal arrest or restraint on
freedom of movement of the degree associated with a formal arrest.[28]  The determination depends on the objective
circumstances, not on the subjective views of either the interrogating officers
or the person being questioned. [29]
Moreover, the determination is made on an ad hoc basis.[30]  Custody is established if the manifestation
of probable cause, combined with other circumstances, would lead a reasonable
person to believe that he is under restraint to the degree associated with an
arrest.[31]  An Aarrest@ occurs Awhen a person=s liberty of movement is successfully restricted or
restrained, whether this is achieved by an officer=s physical force or the suspect=s submission to the officer=s authority.@[32]  An arrest is
complete only if Aa reasonable person in the suspect=s position would have understood the situation to
constitute a restraint on freedom of movement of the degree which the law
associates with a formal arrest.@[33]  The
subjective intent of either the police officer or the defendant is irrelevant.[34]








The court of criminal appeals has outlined some
general situations that may constitute custody, including the following:  (1) when the suspect is physically deprived
of his or her freedom of action in any significant way, (2) when a law
enforcement officer tells the suspect he or she cannot leave, (3) when law
enforcement officers create a situation that would lead a reasonable person to
believe his or her freedom of movement has been significantly restricted, and
(4) when there is probable cause to arrest and law enforcement officers do not
tell the suspect he or she is free to leave.[35]  In the first, second, and third situations,
the restrictions upon freedom of movement must rise to the degree associated
with an arrest as opposed to an investigative detention.[36]  With regard to the fourth scenario, the
officers= knowledge of probable cause must be manifested to
the subject.[37]    The
fact that an appellant becomes the focus of a DWI investigation does not
automatically convert an investigatory detention into an arrest and custodial
interrogation.[38]  An officer=s knowledge
of probable cause to arrest for a DWI does not automatically establish custody.[39]  Numerous cases hold that the mere handcuffing
of a suspect does not automatically transform an investigative stop into a
full-blown arrest.[40]
 

When a person is transported to a law enforcement
facility by an officer in the course of an investigation, if the person was
acting upon the invitation, request, or even the urging of an officer, and
there were no threats that he would be taken in a forcible manner, and the
accompaniment is voluntary, then the individual is not in custody.[41]  Station-house questioning alone does not
constitute custody.[42]  However, police conduct during the encounter
may cause a consensual inquiry to escalate into a custodial interrogation.[43]









The Texas Court of Criminal Appeals stressed in Davis
v. State, 947 S.W.2d 240, 245 (Tex. Crim. App. 1997), that an investigative
detention must be temporary and last no longer than is necessary to effectuate
the purpose of the stop, and the investigative methods employed should be the
least intrusive means reasonably available to verify or dispel the officer's
suspicion in a short period of time.[44]  AThe propriety of the stop's duration is judged by
assessing whether the police diligently pursued a means of investigation that
was likely to dispel or confirm their suspicions quickly.@[45]  Thus, the
constitutional considerations for post‑stop investigations are whether
the detention was too long in duration, whether police officers diligently
pursued means of investigation that were likely to confirm or dispel their
suspicions quickly, and whether police officers were unreasonable in
recognizing less intrusive alternative means by which their objectives might
have been accomplished.[46]  A[A]n investigative detention implies that the
obtrusive act is for the purpose of actually investigating.  Thus, where no investigation is undertaken[,]
the detention cannot be considered investigatory and rises to the level of an
arrest.@[47] 

                                                                  2.  Testimony








Here, Officer Cano testified that he was the first
police officer to arrive at the scene of the accident.  After Officer Cano assisted emergency
personnel in removing the victim from underneath the van, Cano approached
appellant and asked him what happened. 
Cano testified that appellant said he thought he had hit a dog.  Cano further testified that he directed
appellant toward his police car and while walking to the car, he noticed  appellant smelled strongly of alcohol.  Cano also testified that appellant was
staggering so badly that he had to hold on to Cano=s shoulder to keep from falling down.  Cano testified he did not conduct field
sobriety tests at the scene of the accident because he was not certified to do
so.  He also testified he did not call an
outside law enforcement entity (such as DPS) to assist in conducting such tests
because his boss, Chief Rodriguez, told him not to do so.[48]  Cano testified that because he was concerned
for appellant=s Asafety,@ he directed appellant to sit in his police
car.  Cano testified that he did not
consider appellant under arrest when he told him to sit in the police car.








Officer De Hoyos was the second police officer to
arrive at the scene of the accident.  De
Hoyos testified that he encountered appellant when appellant was escorted to
Cano=s police car. 
De Hoyos testified that he smelled alcohol on appellant=s breath.  De
Hoyos ordered Officer Garcia to transport appellant to the police station so
that a field sobriety test could be conducted on appellant.[49]  De Hoyos testified he did not want to conduct
the field sobriety tests at the scene because there were Aa lot of people@ there and his Amain concern was safety.@  De Hoyos
testified that even though the accident occurred in front of appellant=s home, he would not have allowed appellant to go
home or otherwise leave the scene of the accident.  De Hoyos testified he did not arrest
appellant at the scene and did not tell appellant he was under arrest.  De Hoyos testified that he called DPS, even
though Chief Rodriguez had told him not to do so.  A DPS trooper eventually arrived at the
police station, but did not perform any sobriety tests on appellant because he
had already been released.  

Officer Garcia testified that he transported
appellant to the police station as ordered by Officer De Hoyos.  Garcia testified he was told to take
appellant to the station before any DPS troopers arrived.  Garcia testified he was simply following
orders and did not know why appellant was being taken to the station.  Garcia testified that if appellant had asked
to be released on the way to the station, he would have called De Hoyos and
asked for instruction.  Garcia testified
he did not tell appellant he was under arrest and did not tell him he was free
to leave.  Garcia testified that at the
station, appellant was taken to the booking room, which is normally used for
suspects that have been placed under arrest. 
Garcia testified that he did not observe the first round of field
sobriety tests that De Hoyos administered to appellant at the station, but
observed the second round of tests. 
Garcia testified that, in his opinion, appellant did not Apass@ the second round of tests because he  was leaning on a filing cabinet during the
tests.  Garcia testified that in his
opinion, appellant did not have the normal use of his physical or mental
faculties at the time the tests were administered.








Appellant testified that Officer Cano put him in a
police car at the scene and told him he (Cano) Awould
have to take [appellant].@  Appellant
testified that the officer told appellant=s wife that Ahe would have to take me in.@  Appellant
testified that in walking to the police car, he stumbled over a cable.  According to appellant, Anobody asked [him] anything@ at the scene. 
Officer Garcia told appellant that he was going to take appellant to the
police station.  Appellant testified he
did not feel free to leave.  Appellant
was at the station for approximately twenty minutes and was not told that he
could leave.  Appellant thought he was
under arrest.  Appellant testified he did
not refuse to submit to a breath test at the station because he was not asked
to submit to such a test.  Appellant
testified he was told that a DPS trooper was en route to the station and that
he was going to submit to a breathalyzer test when the trooper arrived, but
that Chief Rodriguez released him before the trooper arrived. 

                                                                   3.  Analysis








Officers Cano and De Hoyos both testified that they
smelled alcohol on appellant=s breath.  An
open can of beer was found in the driver=s side front console.[50]  The officers investigating the accident knew
that the victim, Perez, had suffered serious injuries.[51]  On these facts, the issue requiring
investigation was whether appellant was intoxicated.  The record reflects, however, that the
officers did not actually attempt to investigate this issue at the scene.  The investigating officer did not question
appellant as to whether he had been drinking and, if so, how much alcohol he
had consumed.  The Aleast intrusive means@
available to determine if appellant was intoxicated was to conduct a field
sobriety test at the scene of the accident. 
Although Officer Cano testified that he did not do so because he was not
certified to conduct such tests, he also testified that he called Officer J. P.
Rodriguez, the only City of Elsa police officer certified to conduct such
tests, to the scene.  Officer Rodriguez
testified that he arrived at the scene approximately five to eight minutes
after he was called, but that appellant had already been taken to the police
station.  When Officer De Hoyos was asked
why he did not conduct a field sobriety test at the scene of the accident, he
said there were Aa lot of people@ and his Amain concern was safety.@  However,
there is no evidence in the record that conducting a field sobriety test at the
scene would have presented a significant safety risk.  There were four officers present at the
accident scene:  Officers Cano, De Hoyos,
Garcia, and Chief Rodriguez.  In
addition, Officer J. P. Rodriguez arrived at the scene a few minutes after he
was called.  On these facts, we conclude
that the officers failed to investigate whether appellant was intoxicated at
the scene and failed to employ the Aleast intrusive means reasonably available to verify
or dispel [their] suspicion in a short period of time.@[52]  Because the
investigative questioning (conducting field sobriety tests) did not occur until
after appellant was transported to the police station, we conclude that
the investigative detention of appellant at the scene escalated into custody
when he was taken to the station.[53]

                                                            C.  Probable Cause 

Having determined that appellant was taken into
custody when he was taken to the police station, we turn to whether the
officers had probable cause to arrest or take appellant into custody for (1)
driving while intoxicated or (2) any other offense.

                                                             1.  Applicable Law








Law enforcement officers have the authority to
investigate a car accident.[54]  During the investigation, an officer must
develop additional facts constituting probable cause to arrest an individual
for driving while intoxicated.[55]  In order to make a full custodial arrest, an
officer must have probable cause to believe the person he is arresting has
committed or is committing an offense.[56]  Probable cause exists where the facts and
circumstances within the officer's knowledge and of which he has reasonably
trustworthy information are sufficient in themselves to warrant a man of
reasonable caution in the belief that a particular person has committed or is
committing an offense.[57]


                                                                   2.  Analysis 








Here, Officer Cano testified that (1) appellant
acknowledged he was the driver of the vehicle and that he thought he had hit a
dog, (2) appellant smelled strongly of alcohol, (3) appellant was staggering so
badly he had to hold onto the officer for support, and (4) there was an open
24-ounce can of beer on the driver=s side of the front console.  Officer De Hoyos testified that he smelled
alcohol on appellant=s breath. 
Appellant argues that this type of evidence constitutes only reasonable
suspicion to justify further investigation, but is insufficient, without
additional evidence, to constitute probable cause to arrest for driving while
intoxicated.  Appellant cites Rubeck
v. State, 61 S.W.3d 741, 745 (Tex. App.BFort
Worth 2001, no pet.), and Maxcey v. State, 990 S.W.2d 900, 903-04 (Tex.
App.BHouston [14th Dist.] 1999, no pet.), in support of
his position that a suspect must fail field sobriety tests in order for an
officer to have probable cause to arrest for driving while intoxicated.  The State argues that based on the officers= observations at the scene, the officers had
probable cause to arrest appellant for intoxication assault or driving while
intoxicated.  Moreover, the State argues
that even if the officers lacked probable cause to arrest appellant for driving
while intoxicated, there clearly was probable cause to arrest him for public
intoxication.[58]  We conclude it is unnecessary to decide if
there was probable cause to arrest appellant for driving while intoxicated
because there was probable cause to arrest him for public intoxication. 

                                                          3.  Public Intoxication








A person commits the offense of public intoxication
if he appears in a public place while intoxicated to the degree that he may
endanger himself or another.[59]  The test for whether probable cause exists
for a public intoxication arrest is whether the officer=s knowledge at the time of the arrest would warrant
a prudent person in believing that a suspect, albeit intoxicated, was in any
way a danger to himself or another person.[60]  One of the essential elements to the offense
of public intoxication is intoxication Ato the extent that he may endanger himself or
another.@[61]  The fact
that an accused has been involved in a car accident is sufficient probable
cause to believe that he poses a danger to himself or others.[62]  If the officers had probable cause to arrest
appellant for any offense committed in their presence, then a warrant was
unnecessary and the arrest was proper.[63]

Here, Officer Cano testified that when he first
approached appellant at the scene, appellant was Astanding
right by the truck just south of the van@ involved in the accident.  Appellant testified that when he heard the
impact, he parked the van and exited the vehicle.  According to Cano, appellant Aright away came up and told me that he thought he
had hit a dog.@  Thus,
appellant was in a public place.[64]  Based on the officers= observations that appellant smelled of alcohol and
was staggering, we conclude there was probable cause to arrest appellant for
public intoxication.[65]  Accordingly, we conclude appellant=s arrest on the basis of public intoxication was
lawful, and evidence obtained as a result of his lawful arrest was not the
fruit of an illegal arrest.[66]


                                        D.  Admissibility of Post-arrest Evidence  








Although we have concluded that appellant=s arrest was lawful, we turn to his argument that
evidence resulting from his arrest, including the videotape, events at the
police station, and any refusal to submit to a breath test at the station,
should have been suppressed because he was not given the post-arrest warnings
required by Miranda.[67]  Appellant contends that the evidence obtained
pursuant to his Aunlawful@ arrest Ashould have been excluded as fruits of the poisonous
tree@[68] pursuant to the Fourth Amendment to the United
States Constitution[69]
and article 38.23 of the Texas Code of Criminal Procedure.[70]

In his fifth issue, appellant contends the trial
court erred in admitting the videotape of his conversation with Officer Garcia[71]
while appellant was transported to the police station.  

                                                             1.  Applicable Law 








Miranda
holds that when a criminal suspect is placed in custody, law enforcement
personnel must comply with certain procedural safeguards in order to protect
the suspect's privilege against compulsory self‑incrimination under the
Fifth Amendment.[72]  Miranda and its progeny hold
inadmissible incriminating statements made by the accused if the authorities
have not given the requisite warnings and the accused has not waived these
rights.[73]

However, Miranda=s safeguards
apply only when a suspect is placed in custody and interrogated by police.[74]  Custodial interrogation for purposes of Miranda
includes both express questioning, and also words or actions that, given
the officers= knowledge of any special susceptibilities of the
suspect, the officer knows or reasonably should know are likely to Ahave . . . the force of a question on the accused,@ and therefore are reasonably likely to elicit an
incriminating response.[75]  The latter part of this definition focuses
primarily upon the perceptions of the suspect, rather than the intent of the
police.[76]  








Not all post-arrest police questioning can be
classified as interrogation.[77]  Statements given freely and voluntarily are
admissible in evidence.[78]  In distinguishing situations which require
safeguards to protect the privilege against self-incrimination from those that
do not, the Miranda court pointed to isolation and intimidation as key
aspects of an interrogation that undermine an individual=s ability to speak voluntarily.[79]  When an accused in custody spontaneously
volunteers information that is not in response to earlier interrogation by
authorities, the statement is admissible even though not recorded because it is
not the product of custodial interrogation.[80]


Article 38.22 of the Texas Code of Criminal
Procedure codifies both Miranda=s system
of protecting a suspect against self-incrimination and its distinction between
voluntary statements and compelled confessions.[81]  Article 38.22 prohibits the admission of a
written or oral statement made as a result of custodial interrogation by an
accused in a criminal proceeding without the warnings required by Miranda.[82]  However, section five of article 38.22 states
that nothing in the article precludes the admission of a statement that is
either (1) res gestae of the arrest or offense, (2) a statement that
does not stem from custodial interrogation, or (3) a voluntary statement,
whether or not the result of custodial interrogation.[83]  If statements are not made as a result of
custodial interrogation, the requirements of Miranda and article 38.22
do not apply.[84]  Thus, if appellant=s statements were not the result of custodial
interrogation, they are admissible.[85]  








With these principles in mind, we turn to whether
the videotape containing appellant=s conversation with Officer Garcia was admissible
under Miranda and article 38.22.[86]

                                                                   2.  Analysis

At the suppression hearing, Officer Garcia testified
as follows:

A [Garcia]: 
When I got in the unit, when I was backing up, he said, Is the lady
okay?  And then I said, she=s fine. 
Everything is going to be fine. 
Don=t worry.  And
then he said in Spanish that theB that it was a dog. 
Then he said, so he didn=t have the lights on.  And I was just telling him, Don=t worry.  Don=t worry when I was just taking him over there, and
that=s basically all that he said and I just told him
that everything was going to be fine. 

 

. . . .

 

A [Garcia]: 
That happened at the beginning. 
We were basically heading towards theB when
we were arriving at the police department, he [appellant] asked me if he
smelled like alcohol, which I replied not to me. 

 

Q [State]: 
And other than asking you if his breath smelled like beer, a mention of
about a dog and about not having the lights on, do you recall if there were any
other statements the defendant made to you?

 

A:  No, sir,
that=s basically it from the beginning all the way to the
department.

 

. . . .

 

Q [State]: 
Isn=t it true that he [appellant] said, I thought it was
a dog not that it was a dog?

 

A:  (Spanish
spoken).  I thought.

 

Q:  Which
translates, I thought it was a dog?

 

A:  Exactly,
yes.

 

. . . .

 

Q:  But you
did [ask appellant questions]?








A:  Not that I recall.  I didn=t ask him questions. 
He was just asking me and I was replying.

 

Q:  Well, it=s true, isn=t it, that, you know, you did tell him in there, for
instance, well, you know, there=s people saying that the lights were on?

 

A:  Yes.

 

Q:  Okay. 
So you did ask him a question at least one question?

 

A:  No.  HeB that wasn=t a question. 
He asked me, he said that theB they didn=t have the lights on.  And I said, Well, there are people saying
that the lights were on.

 

Q:  And he answered you?

 

A:  I don=t remember if he answered me, though that=s the way it happened.

 

At trial, Garcia testified similarly
regarding the conversation with appellant.

Q
[State]:  And approximately how long did
it take for you to transport the Defendant from the scene of the accident to
the police department, sir, more or less?

 

A
[Garcia]:  A minute and a half, I guess.

 

Q:  And while you were there in the police unit
with the Defendant, sir, did the Defendant ever say anything to you?

 

A:  He said a couple of things, yes.

 

Q:  What exactly did the Defendant say to you,
sir?

 

A:  He told meB he
was saying that it didn=t have the lights on, and then he said it hadB he thought he had hit a dog.  And, also, when we were getting to the police
department, he stated if heB in Spanish, he said, ANo
welo a bironga,@ if I smell likeB he
smelled like alcohol or beer.

 

Q:  And that=s whatB that=s your interpretation of what that means in English?

 

A:  Yes, sir.

 

Q:  And did he sayB other
than it didn=t have the lights on, thought that he hit a dog, and
asking you in Spanish if his breath smelt [sic] like alcohol, was there any
other statement that you can recall?








[Defense
counsel]:  Your Honor, I=m going to object to the interpretation.  I believe he said, ANo welo a bironga,@ which
I believe interprets to ADo I smell like beer,@ not
alcohol, Your Honor.

 

[State]:  I=ll rephrase that, Your Honor.

 

[Court]:  All right.

 

Q
[State]:  Other than saying to you
something about it didn=t have the lights on, thought that he hit a dog, and
does my breath smell like beer, sir, were there any other statements that you
can recall the Defendant making?

 

A:  I can=t recall the other ones, sir.

 

.
. . .

 

[The
videotape was played for the jury].

 

Q
[State]:  Did you hear what the Defendant
said in that portion of the tape, sir?

 

A
[Garcia]:  AYo no
vi que venia.@

 

Q:  AYo@B excuse me?

 

A:  AYo no vi que venia.@

 

Q:  In Spanish?

 

A:  Yes. 
That=s saying that AI didn=t see it coming.@

 

(Portion
of videotape played)

 

[Court]:  Did you hear what was said right there?

 

[Garcia]:  AVenia con las pinche luces apagadas.@

 

Q
[State]:  And what does that mean, sir?

 

A:  He wasB that it was coming with its lights off.

 

(Portion
of videotape played)

 

Q:  Did you hear what was said right there?

 








A:  AEh, buey, no welo a bironga.@

 

Q:  And what does that mean, sir?

 

A:  If he smells like beer. 

 

.
. . . 

 

Q
[State]:  Are there any other statements
that you recall the Defendant making, if any, other than what appeared on the
videotape and what=s been testified to?

 

A:  No, sir. 

 

On these facts, we
conclude that although appellant made these statements while in custody, the
statements did not result from custodial interrogation for purposes of Miranda
and article 38.22.  The record shows that
appellant made the statements voluntarily and that the statements are therefore
admissible.[87]  We overrule appellant=s fifth issue. 









Appellant also argues that admission of the
videotape was harmful because in closing arguments, the State emphasized that
appellant=s speech on the videotape was Aslurred.@  This
argument is without merit.  In Pennsylvania
v. Muniz, 496 U.S. 582, 584 (1990), a case with facts similar to those in
the present case, the United States Supreme Court considered whether various
incriminating statements of a drunk-driving suspect, made while performing a
series of sobriety tests, constituted testimonial responses to custodial
interrogation for purposes of the Fifth Amendment=s
protection against self-incrimination.[88]   The court held that the slurring of speech
and other evidence of lack of muscular coordination constituted nontestimonial
components of the defendant=s responses to questions and therefore were not Atestimonial@ responses for purposes of the privilege against
self-incrimination.[89]

We next address appellant=s argument that evidence of his refusal to submit to
a breath test at the police station should have been suppressed.  

In Muniz, after failing to satisfactorily
perform on a series of sobriety tests, the defendant refused the officer=s request to submit to a breathalyzer test.[90]  The Muniz court noted: 

Muniz does not and cannot challenge the introduction
into evidence of his refusal to submit to the breathalyzer test.  In South Dakota v. Neville, 459 U.S.
553 (1983), we held that since submission to a blood test could itself be
compelled, see Schmerber v. California, 384 U.S. 757 (1966), a State's
decision to permit a suspect to refuse to take the test but then to comment
upon that refusal at trial did not Acompel@ the suspect to incriminate himself and hence did
not violate the privilege.  Neville,
supra, at 562‑564.  We see
no reason to distinguish between chemical blood tests and breathalyzer tests
for these purposes.  Cf. Schmerber,
supra, at 765‑766, n. 9.[91]

 

Thus, we conclude that the trial court did not err
in admitting evidence of appellant=s refusal to submit to a breathalyzer test at the
police station.[92]








The trial court did not err in denying appellant=s motion to suppress evidence resulting from the
arrest, including the videotape, the events at the police station, and any
refusal to submit to a breath test at the police station.  We overrule appellant=s third and fourth issues. 

                                                      E.  Post-release Detention      

In his sixth issue, appellant contends that evidence
of his refusal to take a Asecond@ breath test[93]
at his residence should have been suppressed because his continued detention at
his residence, after he had been released pursuant to a determination that he
was not intoxicated, was unlawful.  We
agree that the trial court erred in admitting evidence of appellant=s alleged refusal to submit to a breath test at his
residence, but find that the error was harmless.  

                                                             1.  Applicable Law








The Texas Court of Criminal Appeals interprets the
language from Florida v. Royer,[94]
Aan investigative detention must be temporary and
last no longer than is necessary to effectuate the purpose of the stop,@ to mean that once the reason for a stop has been
satisfied, police may not Afish@ for evidence of other unrelated criminal activity.[95]  In Davis,[96]
the original stop was for a DWI investigation, but after the officers satisfied
themselves that the driver was not intoxicated, they detained the driver and
passenger until a drug dog could arrive to sniff the car.[97]  A[T]he purpose of the investigative detention was
effectuated when the officers determined appellant was not intoxicated.@[98]

                                                                   2.  Analysis

Here, the evidence shows that appellant passed three
field sobriety tests at the police station and was released.  Nonetheless, approximately an hour and forty
minutes after the accident, Officer Rodriguez went to appellant=s house and obtained appellant=s consent to submit to three additional field
sobriety tests.  Appellant passed all
three tests.  Thereafter, Officer
Rodriguez requested that appellant provide a breath specimen; appellant
refused. 

We conclude that after appellant passed the field
sobriety tests at the police station, the Apurpose of the investigative detention was
effectuated@[99] and the investigation should have concluded.  Accordingly, we hold that the trial court
erred in admitting evidence of appellant=s alleged refusal to submit to a breath test at his
residence.  








However, the erroneous admission of evidence is
non-constitutional error.[100]  We must disregard non-constitutional error
if, after examining the record as a whole, we have fair assurance that the
error did not influence the jury or had but a slight effect.[101]  In making this determination, the question is
not simply whether there was sufficient evidence to support the verdict.[102]  Instead, the reviewing court should consider
the entire record, including testimony, physical evidence, jury instructions,
the State's theories and any defensive theories, closing arguments, and voir
dire, if applicable.[103]  Important factors include the nature of
evidence supporting the verdict, the character of the alleged error, and how it
might be considered in connection with other evidence in the case.[104]  We should also consider whether the State
emphasized the error, whether the erroneously admitted evidence was cumulative,
and whether it was elicited from an expert.[105]

The disputed issue concerned whether appellant was
intoxicated at the time of the accident. 
The evidence elicited regarding officer Rodriguez=s questioning of appellant at his residence was
that, approximately an hour and forty minutes after the accident, appellant (1)
passed three additional field sobriety tests and (2) refused to submit to a
breath test.  The jury also heard
testimony that appellant had refused to submit to a breath  test at the police station before he was
released.  We conclude, after examining
the record as a whole, that the evidence of appellant=s refusal to submit to a breath test at his
residence did not influence the jury or had but a slight effect.[106]  Accordingly, we hold that error in admitting
evidence of appellant=s refusal to submit to a breath test at his
residence was harmless and must, therefore, be disregarded.[107]  We overrule appellant=s sixth issue. 








                                      F.  Alleged Transportation Code Violations

In his seventh issue, appellant contends that
evidence of his refusal to submit to a Asecond@ breath test at his residence should have been
suppressed because the State argues that he was not under arrest, and section
724.012 of the transportation code[108]
only applies to persons under arrest. 
Appellant also argues the evidence of his refusal should be suppressed
because he was not provided the statutorily-required warnings of section
724.015 of the transportation code.[109]  Because we have already determined that the
trial court erred in admitting evidence of appellant=s refusal to submit to a breath test at his
residence on different grounds, but that such error was harmless, we need not
address appellant=s seventh issue.[110]

                                                   IV.  Admissibility of Evidence   

In his eighth issue, appellant contends the trial
court erred in excluding two photographs that he offered into evidence.  Appellant, who was running for mayor of Elsa
during the relevant time period, offered two photographs showing that on
election day, appellant=s political opponent placed a wheelchair and a
Harley Davidson motorcycle at the polling place to remind voters of the
accident.  








We review a trial court's ruling on the
admissibility of evidence under an abuse of discretion standard.[111]
 The test for whether a trial court
abused its discretion is whether the action was arbitrary or unreasonable.[112]  An appellate court must not reverse a trial
court's ruling unless that ruling falls outside the zone of reasonable
disagreement.[113]  

Under Rule 401, evidence is relevant if it makes the
existence of a fact that is of consequence to the determination of the action
more probable than it would be without the evidence.[114]
If the trial court determines the evidence is irrelevant, the evidence is
absolutely inadmissible and the trial court has no discretion to admit it.[115]  Questions of relevance should be left largely
to the trial court and will not be reversed absent an abuse of discretion.[116]  To be included in the expansive definition of
relevant evidence, proffered evidence must have influence over a consequential
fact.[117]

Here, the issue was whether appellant was guilty of
intoxication assault.  The tactics used
by appellant=s opponent in the Elsa mayoral run-off election were
irrelevant to the issue of appellant=s guilt.  We
conclude the trial court did not abuse its discretion in excluding the
photographs.  We overrule appellant=s eighth issue. 


                                                        V.  Motion for New Trial

In his ninth, tenth, and eleventh issues, appellant
contends the trial court erred in denying his motion for new trial.  








A trial court=s ruling denying a defendant=s motion for new trial is reviewed under an abuse of
discretion standard.[118]  Under this standard, we must Aafford almost total deference@ to the trial court's determination of the
historical  facts and of mixed questions
of law and fact that turn upon an evaluation of credibility and demeanor.[119]  We review questions of law, as well as mixed
questions of law and fact that do not turn upon an evaluation of credibility
and demeanor, de novo.[120]

An abuse of discretion occurs when the trial court's
decision is arbitrary or unreasonable.[121]  A trial court's decision to deny a motion for
new trial will be sustained if it is correct on any theory of law applicable to
the case.[122]  

                                                   A.  Alleged Brady Violation[123]








In his ninth issue, appellant argues the trial court
erred in denying his motion for new trial because the State failed to disclose
evidence favorable to his defense. 
Specifically, appellant complains the State failed to disclose  testimony by Officer Patricia Decanini that
J. P. Rodriguez tore up Officer De Hoyos=s original report, which was signed by Officer
Garcia,  stating that appellant passed
the field sobriety tests.  Appellant
argues that Athere is a reasonable probability that had the
evidence been disclosed, the outcome of the trial would have been different
since defense counsel could have nullified the swearing match between Sergeant
De Hoyos against officers J. P. Rodriguez and Flavio Garcia.@  According to
appellant, A[t]he defense could have made the showing that
Flavio Garcia had in fact agreed that [appellant] passed all the exams and that
J. P. Rodriguez knew of that fact and was suppressing it.@  Decanini=s testimony was that Officer J. P. Rodriguez
had  discarded a written report by De
Hoyos, and signed by Officer Garcia, stating that appellant had passed the
field sobriety tests.  She also testified
that J. P. Rodriguez said he was Agoing to fuck over@
appellant.  Decanini testified she was
never contacted by the State and was never listed as a witness.  Decanini testified that she was advised by
appellant that she should go and talk to appellant=s attorney. 
Decanini testified that no one from the district attorney=s office ever questioned her regarding the
information she had; rather, she was Aadvised@ by appellant to see appellant=s attorney.  

At the hearing on the motion for new trial,
appellant=s attorney was asked whether there was any
information he gathered from Officer Decanini that would have helped in the
defense of the case.  Appellant=s attorney stated that the fact that Decanini typed
De Hoyos=s original report, which was signed by Flavio
Garcia, and that the report was destroyed would have been helpful.  At the hearing, it was established, however,
that the State did not have the Amissing@ or Adestroyed@ report by Officer De Hoyos.  Moreover, appellant=s counsel admitted that he knew of the Amissing@ report prior to the commencement of trial.  At the conclusion of the hearing on the
motion for new trial, the trial court noted that at trial, the issue was Aexhausted to no end, almost to the point of having
nausea regarding a missing report.@  








We conclude that Decanini=s testimony would simply have impeached Garcia=s testimony that he did not recall seeing or signing
De Hoyos=s report.  We
conclude appellant has failed to establish that he would have been found not
guilty if Decanini had testified at trial. 
We overrule appellant=s ninth issue. 

                                               B.  ANewly-Discovered@ Evidence

In his tenth issue, appellant contends the trial
court erred in denying his motion for new trial because of the Anewly-discovered@
evidence of Decanini=s testimony. 
We have already determined that Decanini=s
testimony was that J. P. Rodriguez destroyed De Hoyos=s original report. 
We have also already decided that this testimony would not have changed
the outcome of the trial.  We overrule
appellant=s tenth issue.

                                                      C.  Ineffective Assistance

In his eleventh issue, appellant contends his trial
counsel was ineffective for failing to discover Decanini=s testimony.  








Strickland v. Washington,[124]
sets forth the standard of review for effectiveness of counsel.[125]  Strickland requires a two‑part
inquiry.[126]  The defendant must first show that counsel's
performance was deficient, in that it fell below an objective standard of
reasonableness.[127]  Second, the defendant must prove there is a
reasonable probability that but for counsel's deficient performance, the result
of the proceeding would have been different.[128]  A reasonable probability is a probability
sufficient to undermine confidence in the outcome.[129]


The determination regarding whether a defendant
received effective assistance of counsel must be made according to the facts of
each case.[130]  An appellate court looks to the totality of
the representation and the particular circumstances of the case in evaluating
counsel's effectiveness.[131]


The appellant bears the burden of proving by a
preponderance of the evidence that counsel was ineffective.[132]  There is a strong presumption that counsel's
conduct fell within the wide range of reasonable professional assistance.[133]  To defeat the presumption of reasonable
professional assistance, Aany allegation of ineffectiveness must be firmly
founded in the record, and the record must affirmatively demonstrate the
alleged ineffectiveness.@[134]  Generally,
the record on direct appeal will be insufficient to show that counsel=s representation was so deficient as to meet the
first part of the Strickland standard.[135]

Here, we have already determined that Decanini=s testimony that there was an original report would
not have altered the outcome of the trial. 
Accordingly, appellant has failed to establish the second prong of Strickland.  We overrule appellant=s eleventh issue.








                                                         VI.  Dissenting Opinion

We next turn to the arguments raised in the
dissenting opinion.

Although the dissent agrees that there was probable
cause to arrest appellant and that he was arrested at the scene of the
accident, it argues that because he was not read Miranda[136]
warnings, his arrest was Aunlawful@ and all evidence related to the Aunlawful@ arrest (including statements he made to the police
and any refusals to take a breath test) Ashould have been excluded as fruits of the poisonous
tree.@  In support
of this position, the dissent cites Sossamon v. State, 816 S.W.2d 340,
346 (Tex. Crim. App. 1991), Corbin v.State, 91 S.W.3d 383, 385 (Tex.
App.BTexarkana 2002, pet. denied), and article 38.23 of
the code of criminal procedure.[137]  We conclude that the dissent=s reliance on these authorities is misplaced.








In Sossamon, the police had obtained an
involuntary confession and the identity of a witness from the defendant by
making false promises of immunity.[138]  The court found an otherwise valid in-court
identification of the defendant inadmissible because the identifying witness
was located solely through the defendant=s involuntary confession.[139]  Thus, the court held that the witness=s presence in the courtroom, which led to the
identification of the defendant, should have been suppressed pursuant to the
defendant=s Fifth Amendment right against self-incrimination.[140]     

Likewise, in Corbin, the court found the
defendant=s written statement (admitting possession of
cocaine) inadmissible as Afruit of the poisonous tree@ because it was taken after the drugs were
discovered pursuant to an illegal stop.[141]  In both cases, evidence was held inadmissible
because it was obtained as a result of illegal police conduct.   

The dissent also argues that the admission of
appellant=s statements while being transported to the station
and at the station violated article 38.23.[142]  However, in Baker v. State, the court
of criminal appeals has held that Amere violations of the Miranda rule are not
covered by the state exclusionary rule contained in article 38.23.@[143]  Thus,
article 38.23 does not bar the admission of appellant's statements en route to
the station or at the station.








The United States Supreme Court has recently held
that the Afruit of the poisonous tree@ doctrine does not apply to a mere failure to
provide Miranda warnings to a suspect before custodial interrogation
when the suspect makes a voluntary statement.[144]    AThough Miranda requires that the unwarned
admission must be suppressed, the admissibility of any subsequent statement
should turn . . . solely on whether it is knowingly and voluntarily made.@[145]   The
presumption, or Ataint,@ that an unwarned confession was involuntary does
not attach to subsequent statements obtained after a suspect voluntarily and
knowingly waives his or her Miranda rights.[146]


The Texas Court of Criminal Appeals has similarly
held that the Afruit of the poisonous tree@ doctrine does not apply to mere violations of the
prophylactic requirements in Miranda:[147]  The doctrine Arequires
suppressing the fruits of a defendant's statement only when the statement was
obtained through actual coercion.@[148] 

For these reasons, we disagree with the conclusions
reached in the dissenting opinion.

                                                                 CONCLUSION

We AFFIRM the trial court=s judgment.  

                                                            
                                        

LINDA REYNA YAÑEZ,

Justice

 

 

Publish.
Tex. R. App. P. 47.2(b).

 

Dissenting
opinion by 

Chief
Justice Valdez joined by

Justice
Rodriguez.

 

Concurring
opinion by

Justice
Castillo.

 

Opinion
delivered and 

filed
this the 7th day of April, 2006.











[1] See Tex. Pen. Code Ann. ' 49.07(a)(1) (Vernon 2003).





[2] Because appellant=s testimony and the testimony of
others are discussed in greater detail below, we limit our discussion in this
section to a brief chronology of events, taken primarily from the testimony of
the police officers investigating the accident. 






[3] Escamilla v. State, 143
S.W.3d 814, 817 (Tex. Crim. App. 2004) (citing Jackson v. Virginia, 443
U.S. 307, 319 (1979)). 





[4] Jackson, 443 U.S. at 319.





[5] See Malik v. State, 953
S.W.2d 234, 240 (Tex. Crim. App. 1997); Adi v. State, 94 S.W.3d 124, 131
(Tex. App.BCorpus Christi 2002, pet. ref'd).





[6] Malik, 953 S.W.2d at 240. 





[7] Booker v. State, 929 S.W.2d
57, 60 (Tex. App.BBeaumont 1996, pet. ref'd). 





[8] Tex.
Code Crim. Proc. Ann. art. 38.04 (Vernon 1981); Chambers v. State,
805 S.W.2d 459, 461 (Tex. Crim. App. 1991). 





[9] Penagraph v. State, 623 S.W.2d 341, 343 (Tex. Crim.
App. 1981). 





[10] Escamilla, 143 S.W.3d at
817 (citing Zuniga v. State, 144 S.W.3d 477, 484-85 (Tex. Crim. App.
2004)).





[11] Johnson v. State, 23
S.W.3d 1, 10-12 (Tex. Crim. App. 2000). 





[12] Id.  





[13] See Tex. Pen. Code Ann. ' 49.07(a)(1) (Vernon 2003).   





[14] See id.  





[15] Johnson, 23 S.W.3d at 7.





[16] See U.S. Const. amend. IV; Tex.
Code Crim. Proc. Ann. art. 38.23 (Vernon 2005). 





[17] See Ford v. State, 26 S.W.3d 669, 672 (Tex. App.BCorpus Christi 2000, no pet.)
(citing Oles v. State, 993 S.W.2d 103, 106 (Tex. Crim. App. 1999)).





[18] State v. Ballard, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999). 





[19] State v. Ross, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000); Guzman v.
State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). 





[20] Ross, 32 S.W.3d at 856; Guzman,
955 S.W.2d at 89. 





[21] Ross, 32 S.W.3d at 856; Guzman, 955 S.W.2d at 89. 





[22] Villarreal v. State, 935
S.W.2d 134, 138 (Tex. Crim. App. 1996).





[23] See Miranda v. Arizona, 384
U.S. 436, 444 (1966).  





[24] Berkemer v. McCarty, 468
U.S. 420, 440 (1984). 





[25] See State v. Stevenson, 958
S.W.2d 824, 828‑29 (Tex. Crim. App. 1997). 





[26] Galloway v. State, 778 S.W.2d 110, 112 (Tex. App.BHouston [14th Dist.] 1989, no
pet.). 





[27] Abernathy v. State, 963
S.W.2d 822, 824 (Tex. App.BSan Antonio 1998, pet. ref'd).





[28] Lewis v. State, 72 S.W.3d
704, 707 (Tex. App.BFort Worth 2002, pet. ref=d) (citing Stansbury v.
California, 511 U.S. 318, 322 (1994) (per curiam)). 





[29] Id.  





[30] Id. (citing Dowthitt v.
State, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996)).





[31] Id.  





[32] Medford v. State, 13 S.W.3d
769, 773 (Tex. Crim. App. 2000).  Article
15.22 of the code of criminal procedure provides: A[a] person is arrested when he has
been actually placed under restraint or taken into custody by an officer or
person executing a warrant of arrest, or by an officer or person arresting
without a warrant.@ 
However, this is not a controlling legal definition of Aarrest.@ 
Id. at 773-74; see Tex.
Code Crim. Proc. Ann. art. 15.22 (Vernon 2005). 





[33] 
Medford, 13 S.W.3d at 773 (citing U.S. v. Corral-Franco,
848 F.2d 536, 540 (5th Cir. 1988)). 





[34] Id. at 773-74.





[35] Dowthitt, 931 S.W.2d at
255. 





[36] Id.  





[37] Id. 





[38] Stevenson, 958 S.W.2d at
829.





[39] See id. at 829 n.7; Lewis,
72 S.W.3d at 712.





[40] See, e.g., Rhodes v. State,
945 S.W.2d 115, 118 (Tex. Crim. App. 1997) (holding no bright-line rule exists
providing that handcuffing is always the equivalent of arrest and that Rhodes
was not under arrest when officers handcuffed him); Mays v. State, 726
S.W.2d 937, 943-44 (Tex. Crim. App. 1996) (holding officer=s handcuffing of two suspects for
his own safety did not at that point, under the circumstances, constitute an
arrest).





[41] Anderson v. State, 932
S.W.2d 502, 505 (Tex. Crim. App. 1996).





[42] California v. Beheler, 463
U.S. 1121, 1124-25 (1983); Dancy v. State, 728 S.W.2d 772, 778 (Tex.
Crim. App. 1987). 





[43] State v. Rodriguez, 986
S.W.2d 326, 329 (Tex. App.BEl Paso 1999, pet. ref=d). 





[44] Davis v. State, 947 S.W.2d
240, 245 (Tex. Crim. App. 1997).





[45] Id. (quoting Perez v.
State, 818 S.W.2d 512, 517 (Tex. App.BHouston [1st Dist.] 1991, no pet.)). 





[46] Joseph v. State, 865 S.W.2d
100, 102 (Tex. App.BCorpus Christi 1993, pet. ref=d). 





[47] Burkes v. State, 830 S.W.2d
922, 925 (Tex. Crim. App. 1991).  





[48] Chief Rodriguez testified that he
did not order any of the officers at the scene to refrain from calling
DPS.  He testified that a DPS trooper
eventually came to the station, approximately thirty minutes after appellant
was released.   





[49] Officer De Hoyos testified that he
conducted the field sobriety tests on appellant at the station, even though he
is not certified to conduct such tests. 





[50] Appellant testified that although
two passengers were riding in the back seat of the van, he was alone in the
front  seat.  





[51] Cano testified that when Perez was
removed from beneath the van, her left leg was over her right shoulder.  Perez testified that her upper leg was
broken, her lower leg was broken in two places, her foot was almost severed,
and that she suffered multiple burns on her legs.  She was hospitalized for approximately four
weeks and underwent numerous surgeries and skin grafts.  At the time of trial, approximately seven
months after the accident, she was able to walk only short distances with the
aid of a walker.    





[52] See Davis, 947 S.W.2d at
245.  





[53] See id. 





[54] See Tex. Transp. Code Ann. ' 545.351(b)(2) (Vernon 1999) (operator shall control
vehicle speed as needed to avoid colliding with another vehicle); Maxcey v.
State, 990 S.W.2d 900, 903 (Tex. App.BHouston [14th Dist.] 1999, no pet.).  





[55] See Tex. Dep=t of Pub. Safety v. Rodriguez, 953 S.W.2d 362, 364 (Tex. App.BAustin 1997, no pet.). 





[56] 
See Amores v. State, 816 S.W.2d 407, 411 (Tex. Crim. App. 1991). 





[57] Id. at 413. 





[58] See Tex. Pen. Code Ann. ' 49.02(a) (Vernon 2003).





[59] See id.





[60] See Britton v. State, 578
S.W.2d 685, 687 (Tex. Crim. App. 1978).





[61] Id.  





[62] See Carrasco v. State, 712
S.W.2d 120, 122 (Tex. Crim. App. 1986) (holding probable cause existed to
believe driver involved in a one-car accident posed danger to herself or others
for purposes of arrest for public intoxication, where officers observed
symptoms of intoxication in driver); Segura v. State, 826 S.W.2d 178,
184-85 (Tex. App.BDallas 1992, pet. ref=d) (holding officer=s testimony that driver of car
involved in accident was unsteady, had bloodshot eyes, slurred speech, and
alcohol on breath was sufficient probable cause to arrest for public
intoxication). 





[63] See Tex. Code Crim. Proc. Ann. art. 14.01(b) (Vernon 2005) (peace
officer may arrest offender without warrant for any offense committed in his
presence or within his view). 





[64] Because appellant was standing
outside his vehicle, we need not determine whether, under these circumstances,
the vehicle was a Apublic place.@ 
We note that whether a vehicle on a public road or highway is a public
place is a question of fact.  See
Kirtley v. State, 585 S.W.2d 724, 726 (Tex. Crim. App. 1979); Gallagher
v. State, 778 S.W.2d 153, 154-55 (Tex. App.BHouston [1st Dist.] 1989, no pet.)
(holding there was sufficient evidence to support probable cause to arrest passenger
for public intoxication where officer pulled car into parking lot near a busy
boulevard after citizen complained the driver and passenger left a restaurant
intoxicated).  





[65] See Carrasco, 712 S.W.2d at
122; Segura, 826 S.W.2d at 184-85. 






[66] See Anderson, 932 S.W.2d at
506 (holding evidence obtained pursuant to legal arrest was not fruit of
illegal arrest); Warrick v. State, 634 S.W.2d 707, 709 (Tex. Crim. App.
1982) (holding evidence found as a result of lawful arrest for public
intoxication was admissible).





[67] 
It is undisputed that the police did not give appellant the post-arrest
warnings required by Miranda.  See
Miranda, 384 U.S. at 444.





[68]  
The Afruit of the poisonous tree@ doctrine holds that evidence
otherwise admissible but discovered as a result of an earlier violation is
excluded as tainted.  See Missouri v.
Siebert, 542 U.S. 600, 655 (2004).





[69] See U.S. Const. amend. IV.





[70] See Tex. Code Crim. Proc. Ann. art. 38.23(a) (Vernon 2005).





[71] The videotape shown to the jury
involves only the recorded conversation between appellant and Officer Garcia
while appellant was being transported to the police station.  Because the video camera was directed to the
front of the vehicle, the video footage simply reflects the scenery en route to
the police station.  Thus, only the Aaudio@ portion of the videotape is at
issue here. 





[72] See Miranda, 384 U.S. at
444.





[73] See Rhode Island v. Innis,
446 U.S. 291, 302 (1980).





[74] Id. at 300; Jones v.
State, 795 S.W.2d 171, 174-75 (Tex. Crim. App. 1990).





[75] Pennsylvania v. Muniz, 496
U.S. 582, 601 (1990) (citations omitted); Jones, 795 S.W.2d at 174. 





[76] Innis, 446 U.S. at
301.  





[77] Jones, 795 S.W.2d at 174
n.3.





[78] Miranda, 384 U.S. at 478.





[79] Id. at 449-51.





[80] Stevens v. State, 671
S.W.2d 517, 520 (Tex. Crim. App. 1984).





[81] Tex.
Code Crim. Proc. Ann. art. 38.22 '' 2, 3, 5 (Vernon 2005); State v. Waldrop, 7
S.W.3d 836, 838 (Tex. App.BAustin 1999, no pet.).





[82] Tex.
Code Crim. Proc. Ann. art. 38.22 '' 2, 3 (Vernon 2005). 





[83] Id. ' 5 (Vernon 2005); Galloway,
778 S.W.2d at 112.





[84] Waldrop, 7 S.W.3d at 839; Gruber
v. State, 812 S.W.2d 368, 371 (Tex. App.BCorpus Christi 1991, pet. ref=d) (holding statement which is
volunteered and not the product of custodial interrogation is admissible). 





[85] See Waldrop, 7 S.W.3d at
839. 





[86] The videotape was played for the
jury and this Court has reviewed it. 
Although the audio portion of the tape is difficult to understand,
appellant does not challenge that the videotape accurately reflects his
conversation with Garcia. 





[87] See Waldrop, 7 S.W.3d at
839.





[88] Muniz, 496 U.S. at 584.





[89] Id. at 592.  





[90] Id. at 586.  





[91] Id. at 604 n.19.  





[92] See id.; see also
Griffith v. State, 55 S.W.3d 598, 603 (Tex. Crim. App. 2001) (holding
admission into evidence of defendant's refusal to submit to blood-alcohol test
does not offend right against self‑incrimination); Miffleton v. State,
777 S.W.2d 76, 79-80 (Tex. Crim. App. 1989) (a defendant=s verbal refusal to submit to a
breath test does not fall within state privilege against self-incrimination
where defendant is not physically or mentally compelled to refuse the test).





[93] Appellant denied that he was asked
to submit to a breath test at his residence. 






[94] Florida v. Royer, 460 U.S.
491, 500 (1983).





[95] Hartman v. State, 144
S.W.3d 568, 573 n.3 (Tex. App.BAustin 2004, no pet.) (citing Davis, 947 S.W.2d at
243); see also State v. Thirty Thousand Six Hundred Sixty Dollars, 136
S.W.3d 392, 403 (Tex. App.BCorpus Christi 2004, pet. denied) (holding that after
suspect passed field sobriety test, officer=s original suspicion that suspect was intoxicated was
dispelled and the purpose of the investigative detention was fulfilled).  





[96] See Davis, 947 S.W.2d at
240. 





[97] See id. at 241.  





[98] Id. at 245.  





[99] See id.  





[100] See King v. State, 953
S.W.2d 266, 271 (Tex. Crim. App. 1997); Gigliobianco v. State, 179
S.W.3d 136, 145 (Tex. App.BSan Antonio 2005, no pet.); Schaum v. State, 833
S.W.2d 644, 647 (Tex. App.BDallas 1992, no pet.) (proper to use harm analysis if trial
court admits evidence of refusal to submit breath or blood specimen, even
though written warning required by statute not given).   





[101] See Tex. R.
App. P. 44.2(b); Solomon
v. State, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001).





[102] Bagheri v. State, 119
S.W.3d 755, 763 (Tex. Crim. App. 2003). 





[103] 
Id. (citing Motilla v. State, 78 S.W.3d 352, 355‑56
(Tex. Crim. App. 2002)). 





[104] Id. 





[105] Id.  





[106] See Solomon, 49 S.W.3d at
365.  





[107] See Tex. R. App. P. 44.2(b); King v. State, 953 S.W.2d
266, 271-73 (Tex. Crim. App. 1997).





[108] See Tex. Transp. Code Ann. ' 724.012 (Vernon Supp. 2005).





[109] See id. ' 724.015 (Vernon Supp. 2005).





[110] See Tex. R. App. P. 47.1. 





[111] See Montgomery v. State,
810 S.W.2d 372, 391 (Tex. Crim. App. 1990). 





[112] State v. Mechler, 153
S.W.3d 435, 439 (Tex. Crim. App. 2005).





[113] Burden v. State, 55 S.W.3d
608, 615 (Tex. Crim. App. 2001).





[114] Tex.
R. Evid. 401; Moses v. State, 105 S.W.3d 622, 626 (Tex. Crim.
App. 2003).  





[115] See Webb v. State, 991 S.W.2d 408, 418 (Tex. App.BHouston [14th Dist.] 1999, pet. ref=d).





[116] See id.  





[117] See id.  





[118] Salazar v. State, 38 S.W.3d
141, 148 (Tex. Crim. App. 2001). 





[119] Guzman, 955 S.W.2d at  89; Jennings v. State, 107 S.W.3d 85,
89-90 (Tex. App.BSan Antonio 2003, no pet.). 





[120] Jennings, 107 S.W.3d at 90
(citing Guzman, 955 S.W.2d at 89). 





[121] State v. Read, 965 S.W.2d
74, 77 (Tex. App.BAustin 1998, no pet.). 





[122] Id.





[123] See Brady v. Maryland, 373
U.S. 83, 87 (1963) (holding that the State has an affirmative duty to make
exculpatory evidence in its possession available to an accused). 





[124] Strickland v. Washington,
466 U.S. 668, 687 (1984).





[125] See Thompson v. State, 9
S.W.3d 808, 812 (Tex. Crim. App. 1999).





[126] Id.  





[127] Id.





[128] Id.





[129] Id.





[130] Id.





[131] Id.





[132] Id. at 813.





[133] Id.





[134] 
McFarland v. State, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996).





[135] Mitchell v. State, 68
S.W.3d 640, 642 (Tex. Crim. App. 2002).





[136] See Miranda, 384 U.S. at
444.  





[137] Article 38.23 is the state
exclusionary rule.  See Tex. Code Crim. Proc. Ann. art.
38.23(a) (Vernon 2005) (evidence obtained in violation of state or federal
constitutions or laws is inadmissible against the accused). 





[138] Sossamon v. State, 816
S.W.2d 340, 349 (Tex. Crim. App. 1991).





[139] Id.  





[140] Id.; See U.S. Const. amend. V.  





[141] Corbin v. State, 91
S.W.3d 383, 385 (Tex. App.BTexarkana 2002, pet. denied).  





[142] 
See Tex. Code Crim. Proc.
Ann. art. 38.23(a) (Vernon 2005).





[143]  
Baker v. State, 956 S.W.2d 19, 24 (Tex. Crim. App. 1997).





[144] See U.S. v. Patane, 542
U.S. 630, 673 (2004) (holding failure to give suspect Miranda warnings
did not require suppression of physical fruits of suspect's unwarned but
voluntary statement).





[145] Oregon v. Elstad, 470 U.S.
298, 309 (1985).





[146] Id.  We note that in Siebert, the U.S.
Supreme Court invalidated the "question first" technique of
interrogation, in which the police intentionally interrogate suspects without
warnings, obtain confessions, and then, after providing the required Miranda
warnings, interrogate the suspects again to obtain a second confession for
use in court.  See Siebert, 542
U.S. at 658. 





[147] 
Baker, 956 S.W.2d at 22.





[148] Id.